**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARL KAUFFMAN, III, | : | CIVIL NO. 1:13-CV-659 |
| | : | |
| Plaintiff, | : | (Judge Kane) |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| DANIEL BAR BARGELLO, et al., | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

For approximately five hours on the evening of March 21, 2012, two Cumberland Township Police Officers, Daniel Barbagello and Ryan Eiker, were confronted by a conundrum.  A routine traffic stop of the plaintiff, Carl Kauffman, had become a riddle, a riddle of Kauffman's own making as Kauffman displayed what the officers perceived to be inexplicably odd behavior.

For Barbagello, Eiker and Kauffman this odd conduct, which included highly overwrought behavior, inappropriate anxiety, crying, and a failure to follow simple instructions, created an intractable dilemma.  The objective facts gave the officers misgivings regarding whether Kauffman was in a state where he could safely operate a motorcycle, and the police were unable to determine the root cause of this agitated

behavior, which potentially jeopardized Kauffman's safety and the safety of other motorists.

Presented with this riddle, conundrum and dilemma, the essentially undisputed facts show that police acted prudently, systematically addressing, and eliminating potential chemical, medical and mental causes for Kauffman's odd behavior before releasing him to return to his motorcycle.  Thus, on March 21, 2012, these police officers found themselves navigating that " ' " hazy border between excessive and acceptable [conduct under the Fourth Amendment], " ' <u>Brosseau, supra</u>, at 201, 125 S.Ct. 596 (<u>quoting Saucier</u>, 533 U.S., at 206, 121 S.Ct. 2151; some internal quotation marks omitted)." <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 312, 193 L. Ed. 2d 255 (2015). They were compelled to navigate this course due to the behavior of Mr. Kauffman, which by all measures was objectively disturbing and inexplicable.

Having navigated this course in a way designed to protect the safety of both Mr. Kauffman and others, the defendants are now accused of having failed to adequately protect Mr. Kauffman's rights during this law enforcement encounter.  However, recognizing, as we do, that the doctrine of qualified immunity is specifically designed and intended to protect police officers from individual civil liability for conduct which falls along the "hazy border between excessive and acceptable [conduct under the Fourth Amendment], " <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 312, 193 L. Ed. 2d 255

(2015), for the reasons set forth below, it is recommended that the defendants' motion for summary judgment be granted, and this case be dismissed.

## II.     Statement of Facts and of the Case

### A.     Factual Background

This case comes before us for consideration of a motion for summary judgment filed by the remaining defendants in this lawsuit, Officers Daniel Barbagello and Ryan Eiker, of the Cumberland Township Police Department, (Doc. 64.), and presents legal questions concerning the reasonableness of the detention of the plaintiff, Carl Kauffman, following a police traffic stop.   The essentially uncontested factual background of this case can be simply stated:   On the evening of March 21, 2012, the plaintiff, Carl Kauffman, was attending night classes at the Harrisburg Area Community College.   Following his night classes, Kauffman left the campus, riding on his motorcycle.   As Kauffman rode the motorcycle, Officer Barbagello, a Cumberland Township Police Officer, who was on patrol, observed Kauffman illegally passing two vehicles in a no-passing zone.   Specifically, Kauffman passed the vehicles on the right shoulder of the roadway.   As he followed Kauffman and attempted to pull him over, Officer Barbagello observed Kauffman driving behind the fog line and in the traffic way, continually teetering back and forth.   Officer Barbagello followed Kauffman for approximately a quarter mile with his lights flashing before Kauffman

pulled over.  When Kauffman finally stopped his motorcycle he pulled the wrong way into a one-way parking lot.

A traffic stop then ensued between Officer Barbagello, who was later joined by Officer Eiker, and Mr. Kauffman.  In the course of this traffic stop, the police officers were confronted by what they perceived to be bizarre behavior on Kauffman's part. Kauffman appeared distraught and nervous, and his eyes were bloodshot, a potential indication of drug and alcohol use.  Moreover, Kauffman was breathing heavily as the officers approached him, and exuded a thick flowery odor, which the officers suspected could be a masking agent used to conceal some other scent.  Kauffman also struggled with simple questions, and it took several attempts for Kauffman to understand, and comply with, the police officer's request for his license and registration.

It is also essentially undisputed that Kauffman was emotionally overwrought and began weeping as the officer conducted this traffic stop.  This behavior led the officers to ask Kauffman to submit to a field sobriety test, which he agreed to do.  As part of this test Kauffman was provided simple instructions regarding tasks he was asked to perform. The officers found, however, that Kauffman's mental state was such that he could not comply with their instructions.   Accordingly, police informed

Kauffman that he failed portions of the test due to his inability to understand and follow these instructions.

Presented with the enigma of Kauffman's confused and confusing conduct, police were confronted with a public safety dilemma. It is undisputed that the officers had a subjective concern that Kauffman could not safely operate a motorcycle in his agitated state of mind. The objective evidence regarding the state of Kauffman's apparent agitation throughout the evening of March 21, 2012, which includes medical reports of Kauffman's presenting behavior as well as the accounts of the parties themselves, reveals that these subjective concerns were well-founded.

Confronted with this dilemma, the evidence discloses that the police proceeded in a prudent and systematic way to try to address these public safety concerns. First, the officers asked Kauffman if he could obtain a ride home from a friend or family member. Despite several entreaties by police to have a family member or friend assist Kauffman, the plaintiff consistently declined requests to reach out to others for assistance.[1]

---

[1]We understand that it is the plaintiff's position that there was no one readily available to assist him late at night on March 21, 2012. While we credit this assertion, it does not change the fact that the undisputed record shows that police strived throughout the evening to systematically untangle the conundrum created by Kauffman's conduct in a way the ensured both his safety and the security of other motorists without prolonging his detention.

Police also began a careful effort to ascertain what might be the root cause of Kauffman's behavior.  First, at the scene police administered a Breathalyzer test administered to Kauffman.  While this test showed no signs of alcohol intoxication, Officer Barbagello remained concerned that Kauffman was impaired in some fashion and was unsafe to operate a motorcycle late at night.  Police also offered Kauffman and opportunity to contact someone to get a ride home, but he declined this offer.[2] After consulting with his superiors, and speaking with Kauffman, Officer Barbagello offered Kauffman an opportunity to meet with a Pennsylvania State Police Trooper, Trooper Bivens, who was trained as a Drug Recognition Expert (DRE) to perform evaluations on subjects following a twelve (12) step scientific systematic process to determine whether an individual in impaired by drugs.  Kauffman was then transported by police the State Police Barracks for this evaluation.

Trooper Bivens began this DRE evaluation by interviewing the arresting officer, Officer Barbagello, who explained that he had stopped Kauffman for passing two vehicles while riding on the right shoulder.  Officer Barbagello further explained that after being stopped Kauffman was upset, forgot why he was stopped and where he was going, and gave signs of being under the influence during a field sobriety

---

[2]It seems that Kauffman may have at some time during this stop contacted his wife and misled her, concealing the police stop and telling her that he was staying after class to speak with a faculty member.

test, but that no alcohol was detected in a Breathalyzer examination. Barbagello told Trooper Bivens that he believed that Kauffman was laboring under some impairment and feared injury of Plaintiff or others if he was permitted to operate his motorcycle. Trooper Bivens then performed a DRE evaluation on Kauffman at the request of Officer Barbagello. At the conclusion of this evaluation, Trooper Bivens concluded that Kauffman was not chemically impaired, but expressed a concern that he was suffering from some emotional or mental health issue.

Having now excluded both alcohol and drug use as root causes for Kauffman's troubling and agitated behavior, but harboring a continued concern that Kauffman was not fit to drive, Officer Barbagallo provided Kauffman the opportunity to call his wife, or the choice between being transported to the jail or the hospital. Kauffman declined to contact his wife, and instead chose to be transported to the hospital where he underwent a mental health evaluation. Staff who assessed Kauffman at the hospital characterized his behavior as very bizarre, noting that Kauffman was tearful, emotionally inappropriate and extremely anxious throughout the assessment. Ultimately Kauffman was diagnosed as suffering from anxiety and a stress reaction, but it was determined that Kauffman's condition did not meet the exacting standards for involuntary mental health commitment under state law, and he was released.

### B.      The Defendants' Motion for Summary Judgment

Following this episode, Kauffman filed the instant lawsuit which named Officers Eiker and Barbagello as defendants, and alleged that the police conduct violated Kauffman's rights under the Fourth Amendment to the United States Constitution as well as constituting common law torts under Pennsylvania law. (Doc. 1.) Following discovery, these remaining defendants have now moved for summary judgment on these claims, arguing in part that they are entitled to qualified immunity from liability in this case because Kauffman has not shown that their conduct violated clearly established constitutional norms. (Doc. 64.) This motion is fully briefed by the parties and is, therefore, ripe for resolution.

For the reasons set forth below, it is recommended that the defendants' motion for summary judgment be granted.

### II.   Discussion

### A.      Summary Judgment - Rule 56, Standard of Review

Federal courts are permitted to summarily adjudicate an action in order to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a jury trial would, therefore, "be an empty and unnecessary formality," Peynado v. Sabol, No. 09-355, 2010 U.S. Dist. LEXIS 134131, 2010 WL 5300563, at *2 (M.D. Pa. Dec. 20, 2010). Rule 56 specifically

provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56. The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.

Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.  Anderson, 477 U.S. at 249.   There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

It is through this analytical lens that we now assess the plaintiff's current motion for summary judgment.

## B.   The Defendants Are Entitled to Qualified Immunity in This Case

In this case the gist of Kauffman's constitutional claim is that the defendants violated his rights through their unlawful detention of the plaintiff on March 21, 2012. This claim implicates Kauffman's rights under the Fourth Amendment to the United States Constitution, which provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and now Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

In this case, though, we must consider the propriety of the police action both in the context of criminal law enforcement and through the separate analytical lens of police public safety responsibilities when presented with a person who may be suffering from a mental or emotional impairment which could potentially render that individual a danger to himself or others.  Further, we must remain mindful of the fact that, while Kauffman must show the deprivation of a right secured by the United States Constitution or the laws of the United States, satisfying these elements alone does not guarantee that Kauffman is entitled to recover damages from Officers Barbagello and Eiker.

Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, 555 U.S. 223 (2009).  This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit."  Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity

balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries.  First, the court must evaluate whether the defendant violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006).  If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor.  Saucier, 533 U.S. at 201.  If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted.  Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right.  Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

When assessing questions of qualified immunity, the court is no longer required to conduct these two inquiries sequentially, <u>Pearson</u>, 555 U.S. at 239-40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. <u>Id.</u> Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. <u>Gruenke v. Seip</u>, 225 F.3d 290, 299-300 (3d Cir. 2000); <u>Crouse</u>, 668 F. Supp. 2d at 671; <u>see also</u> <u>Grant v. City of Pittsburgh</u>, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. <u>See</u> <u>Montanez v. Thompson</u>, 603 F.3d 243 (3d Cir. 2010).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." <u>Wilson</u>, 526 U.S. at 615.

Thus, a plaintiff cannot defeat an qualified immunity claim in a Fourth Amendment constitutional tort case by merely asserting, as Kauffman does, that as a general matter the Fourth Amendment right to be free from unreasonable searches and seizure has been clearly established.  Much more is needed to defeat a claim of qualified immunity in a Fourth Amendment context.  Indeed, the Supreme Court has recently rejected efforts to use sweeping Fourth Amendment constitutional pronouncements to defeat qualified immunity claims, noting that:  "Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."  City & Cnty. of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765, 1776, 191 L. Ed. 2d 856 (2015).  See Anderson v. Creighton, 483 U.S. 635, 641 (1987).

Instead, the Supreme Court has cautioned us that much greater factual congruence between a defendant's conduct and settled case law is needed in order to defeat a claim of qualified immunity.  Indeed, the Supreme Court has expressly admonished us that "qualified immunity protects actions in the ' "hazy border between excessive and acceptable [conduct under the Fourth Amendment]." ' Brosseau, supra, at 201, 125 S.Ct. 596 (quoting Saucier, 533 U.S., at 206, 121 S.Ct. 2151; some internal quotation marks omitted)."  Mullenix v. Luna, 136 S. Ct. 305, 312, 193 L. Ed. 2d 255 (2015).  As the Court observed:

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. ——, ——, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al–Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "We have repeatedly told courts ... not to define clearly established law at a high level of generality." al–Kidd, supra, at 742, 131 S.Ct. 2074. The dispositive question is "whether the violative nature of particular conduct is clearly established." Ibid. (emphasis added). This inquiry " 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam ) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

Mullenix v. Luna, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015).

Applying these exacting legal tenets in terms of the factual fit required to define the law as clearly established in the field of Fourth Amendment claims against police officers, which often play out against murky factual backdrops, courts have frequently relied upon Mullenix to hold that officers are entitled to qualified immunity in such cases. Compare Rush v. City of Lansing, No. 15-1225, 2016 WL 787891, at *10 (6th Cir. Feb. 29, 2016)(granting summary judgment); Swift v. McNatt, No. 15-1009, 2015 WL 9165967, at *4 (W.D. Tenn. Dec. 16, 2015)(same) with Pauly v. White, No. 14-2035, 2016 WL 502830, at *11 (10th Cir. Feb. 9, 2016).

A close factual congruence between settled case law and the conduct at issue in the instant case is required to defeat a claim of qualified immunity because the constitutional benchmarks for assessing police conduct in this setting have substantial factual components.  For example, at the outset, " 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.' Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); see also Prouse, 440 U.S. at 663, 99 S.Ct. 1391 (stop of vehicle must be based on reasonable suspicion of criminal activity)."  United States v. Johnson, 592 F.3d 442, 447 (3d Cir. 2010). "When assessing whether the vehicle stop was supported by reasonable suspicion, we must consider the 'totality of the circumstances to determine whether "the detaining officers ... [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity." ' United States v. Brown, 448 F.3d 239, 246 (3d Cir.2006) (quoting United States v. Cortez, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981))." United States v. Johnson, 592 F.3d 442, 448-49 (3d Cir. 2010).

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Florida v. Royer, 460 U.S. 491, 500

(1983).   However, the reasonable duration of any investigative detention must be measured by the facts and circumstances confronting the police.   When police are confronted by uncertain circumstances, an investigative detention spanning several hours may be both reasonable and proper.   Compare United States v. Maltais, 403 F.3d 550 (8th Cir. 2005)(3 hour detention appropriate) with United States v. Fraguela-Casanova, 858 F. Supp. 2d 432 (M.D. Pa. 2012)(94 minute detention excessive).

Beyond an initial investigative detention police are empowered to arrest those persons as to whom probable cause exists to believe that they have committed a criminal offense.   Like the legal tests governing an investigative detention, the standards for assessing whether an arrest has occurred and whether police possessed probable cause to arrest are often largely factual determinations.   Accordingly, "[t]o state a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause. See Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir.1995); Dowling v. City of Phila., 855 F.2d 136, 141 (3d Cir.1988)." James v. City of Wilkes-Barre, 700 F.3d 675, 680 (3d Cir. 2012).   An arrest without probable cause is a constitutional violation that may be redressed under 42 U.S.C. § 1983.  See Walmsley v. Philadelphia, 872 F.2d 546, 551 (3d Cir. 1989) (citing Patzig v. O'Neill, 577 F.2d 841, 848 (3d Cir. 1978). However, '[w]e examine the totality of the circumstances in determining whether a

seizure [or arrest] occurred." James v. City of Wilkes-Barre, 700 F.3d 675, 680 (3d Cir. 2012).

Likewise, for purposes of the Fourth Amendment, probable cause to arrest exists "whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). An arrest by a police officer without a warrant "is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). In conducting an inquiry into whether probable cause to arrest existed, a court should consider the totality of the circumstances presented, and "must assess the knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest." United States v. Stubbs, 281 F.3d 109, 122 (3d Cir. 2002).

Beyond these criminal law enforcement tenets, the reasonableness of the police officers' conduct must also be viewed in the context of civil, public safety concerns when police encounter those who may be suffering from some degree of mental or

emotional impairment which may render them a danger to themselves or others.  In this

specific factual context, it is well-settled that:

> The Fourth Amendment applies to seizures in civil, as well as criminal, proceedings. See O'Connor v. Ortega, 480 U.S. 709, 714–15, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987).  The fundamental inquiry in such proceedings, however, remains whether the government's conduct is reasonable under the circumstances. See Cady v. Dombrowski, 413 U.S. 433, 439–40, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973). Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (citations omitted).  Construing Griffin, the Court of Appeals for the First Circuit held that the temporary involuntary commitment of those deemed dangerous to themselves or others qualifies as a "special need" permitting the state to act without a warrant. See McCabe, 77 F.3d at 549. We agree.

Doby v. DeCrescenzo, 171 F.3d 858, 871 (3d Cir. 1999).  As this Court has observed:

> A recognized exception to the warrant requirement may occur when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."   Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) . . . . Seizures pursuant to the [Pennsylvania Mental Health Statute] can fall within the "special needs" exception to the warrant and probable cause requirements. See Doby, 171 F.3d at 871 ("[T]he temporary involuntary commitment of those deemed dangerous to themselves or others [pursuant to the MHPA] qualifies as a 'special need' permitting the state to act without a warrant.").

Mayo v. City of York, PA, No. 1:04-CV-2272, 2007 WL 91599, at *6 (M.D. Pa. Jan.

9, 2007).  Pennsylvania law, in turn, "allows peace officers who observe an individual

behaving in such a way that gives an officer 'reasonable grounds to believe that [the

individual] is severely mentally disabled and in need of immediate treatment,' to submit

that individual to a mental health evaluation by medical personnel who are to determine whether that individual should be involuntarily committed.  50 Pa. Stat. Ann. tit. 50 § 7302(a)(2).  The MHPA further provides civil and criminal immunity for peace officers participating in an involuntary commitment process, so long as their conduct is without 'willful misconduct or gross negligence.'  50 Pa. Stat. Ann. § 7114(a)."  Kauffman v. Barbagello, No. 1:13-C-00659, 2013 WL 6388487, at *9 (M.D. Pa. Dec. 5, 2013). Applying these legal standards, it has been held that police officers who transport an individual to a hospital without his consent for a psychiatric evaluation do not violate any clearly established constitutional right, and thus, were entitled to qualified immunity in the individual's § 1983 suit , since no case law would have put the officers on notice that a plaintiff's indisputably strange behavior did not rise to a level justifying an involuntary psychiatric evaluation.   Must v. W. Hills Police Dep't, 126 F. App'x 539 (3d Cir. 2005).

Guided by these benchmarks, we find that Officers Barbagello and Eiker did not violate any clearly established constitutional rights of the plaintiff during their law enforcement encounter with Mr. Kauffman.  In reaching this conclusion, we emphasize that  on March 21, 2012, these police officers found themselves navigating a " ' " hazy border between excessive and acceptable [conduct under the Fourth Amendment], " ' Brosseau, supra, at 201, 125 S.Ct. 596 (quoting Saucier, 533 U.S., at 206, 121 S.Ct.

2151; some internal quotation marks omitted)." <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 312, 193 L. Ed. 2d 255 (2015).  We further note that the initial stop of Mr. Kauffman was fully justified by probable cause to believe that he had committed traffic offenses, a conclusion which Kauffman does not dispute since he pleaded guilty to these traffic offenses.

Once Kauffman was initially stopped, the objective circumstances including Kauffman's agitated behavior, gave rise to a reasonable suspicion that he might be under the influence of drugs or alcohol.  This objectively reasonable suspicion justified a further investigative detention of Kauffman as police took prudent steps to determine whether he had committed additional, and more serious, offenses by operating a motorcycle while chemically impaired.  The duration of that investigative detection was appropriate and reasonable, given the circumstances confronting the police the lateness of the hour, and the need to utilize the services of a Drug Recognition Expert, Trooper Bivens, to resolve these questions.

Once police had excluded drugs and alcohol as the root causes for Kauffman's on-going odd behavior, they were confronted with potential mental health and public safety concerns.  Police could not have reasonably allowed Kauffman, a person whose mental stability was in doubt, to operate a motorcycle in the early morning hours of March 22, 2012.  Indeed, at the time of these events case law plainly indicated that such

conduct by the defendants could have exposed police to federal civil rights liability under the state-created danger doctrine. See Kneipp v. Tedder, 95 F.3d 1199, 1209 (3d Cir. 1996) (police officer who removed a sober driver and left behind a passenger whom he knew to be drunk with the keys to the car was subject to liability under 42 U.S.C. § 1983). Thus, clearly established case law indicated that police could be civilly culpable if they permitted Kauffman, someone they believed to be impaired, to nonetheless operate a motor vehicle.

Given this clearly established case law indicating that it would be improper to allow an apparently impaired person to operate a motor vehicle, police chose to follow a different course, one which has been expressly approved by the courts, and transported Kauffman to the hospital so that he could be psychiatrically evaluated. Must v. W. Hills Police Dep't, 126 F. App'x 539 (3d Cir. 2005). Given the conundrums confronting the police officers on March 21–22, 2012, nothing could have alerted them that, by eschewing a course condemned by the courts and instead adopting a path expressly sanctioned by courts in the past, they would have violated "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Therefore, Officers Eiker and

Barbagello should be entitled to qualified immunity from damages with respect to the Fourth Amendment claims in this case and the complaint should be dismissed.[3]

## III.   Recommendation

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' motion for summary judgment, (Doc. 64.), be GRANTED.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

---

[3]Finally, we note that this proposed disposition of the plaintiff's federal constitutional claims, in turn, suggests the appropriate course for the court to follow in addressing any ancillary state law claims that the plaintiff may wish to pursue against this defendant.  In a case such as this, where the jurisdiction of the federal court was premised on alleged federal claims which are found to be subject to dismissal, the proper course generally is for "the court [to] decline to exercise supplemental jurisdiction over the plaintiff's state law claims.  28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-... the district court has dismissed all claims over which it has original jurisdiction."); United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding that when federal causes of action are dismissed, federal courts should not separately entertain pendent state claims)." Bronson v. White  No. 05-2150, 2007 WL 3033865, *13 (M.D.Pa. Oct. 15, 2007)(Caputo, J.)(adopting report and recommendation dismissing ancillary malpractice claim against dentist); see Ham v. Greer, 269 F. App'x 149, 151 (3d Cir. 2008)("Because the District Court appropriately dismissed [the inmate's] Bivens claims, no independent basis for federal jurisdiction remains.  In addition, the District Court did not abuse its discretion in declining to address the state law negligence claims. 28 U.S.C. § 1367(c)(3); see United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Tully v. Mott Supermkts., Inc., 540 F.2d 187, 196 (3d Cir.1976).")  Since we have found that these federal claims fail, this Court should not entertain the pendent state law claims made by Kauffman against these defendants.

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 16th day of March 2016.


### _S/Martin C.  Carlson_
Martin C. Carlson
United States Magistrate Judge